**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| LOLA COOPER, ) | CASE NO.  5:09-cv-1446 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MAGISTRATE JUDGE VECCHIARELLI |
| MICHAEL J. ASTRUE, ) | |
|   Commissioner of Social Security, ) | |
| ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff, Lola Cooper ("Cooper"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Cooper's applications for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c) (2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and REMANDED.

## I. Procedural History

Cooper filed her applications for DIB and SSI on December 19, 2005 alleging disability beginning September 12, 2005.  Her applications were denied initially.  Cooper appealed only the denial of her SSI claim, which was denied upon reconsideration.  Cooper timely requested an administrative hearing.

Administrative Law Judge ("ALJ"), John D. McNamee-Alemany, held a hearing on April 18, 2008, at which Cooper; her attorney; Michael Edds, Cooper's case manager; and Mr. Berkheimer, vocational expert ("VE") testified.  The ALJ issued a decision on May 13, 2008, in which he determined that Cooper was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.  Cooper filed an appeal to this Court.

On appeal, Cooper claims the ALJ erred by:  (1) failing to adequately explain his reasons for not according controlling weight to the opinion of Cooper's treating physician; and (2) finding there exists a substantial number of jobs in the national economy that Cooper can perform.  The Commissioner disputes these claims.

## II. Evidence

### A.  Personal and Vocational Evidence

Cooper was born on October 6, 1979.  (Transcript ("Tr.") 86).  She was 29 years old at the time of her hearing.  She has a high school education.  (Tr. 16, 112).  Cooper has no past relevant work.  (Tr. 16).

### B. Medical Evidence

On September 2, 2005, Cooper was taken by ambulance to Westchester Medical

Center ("Westchester") due to of out of control behavior including screaming and yelling that someone was trying to kill her. (Tr. 175).  She was noted to be extremely paranoid, extremely hyper-vigilant, very afraid, and unable to be redirected. (Tr. 175).  Her boyfriend reported that she had twice recently been seen at a hospital for stating that people were trying to kill her.  (Tr. 175).  Her admitting diagnosis was schizophrenia paranoid type, and she was assessed with a GAF score of 10.[1]  (Tr. 176).

On September 21, 2005, Cooper was discharged.  Her discharge diagnosis was schizophrenia paranoid type, cocaine abuse by history, rule out schizoaffective disorder.  Her GAF score at discharge was 57.[2]  (Tr. 175).  Cooper was advised to continue intensive outpatient therapy at Westchester, to follow up with a psychiatrist, and to maintain sobriety.   She was prescribe Zyprexa and Paxil.  (Tr. 176).

On September 24, 2005, Cooper was admitted to Mount Vernon Hospital ("Mt. Vernon") after an acute recurrence of fears that people were trying to harm her.  (Tr. 213). Cooper reported that she had approximately four lifetime psychiatric hospitalizations beginning at age 15.  (Tr. 214).  She reported witnessing the shooting of someone close to her approximately five years ago, but she would not discuss the

---

[1] A GAF score of between 0 and 10 indicates a persistent danger of severely hurting self or others, or persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

[2] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra* at 34.

details. (Tr. 215). She also reported prior cocaine use many years ago. (Tr. 214-215). Cooper was discharged on October 7, 2005. At the time of her discharge, Cooper was not acutely paranoid, nor was she a danger to herself. Cooper agreed to continue her medication, from which she had no adverse side effects. (Tr. 249).

On October 12, 2005, Cooper presented to Saint Vincent Catholic Medical Center where she was referred for aftercare by Mt. Vernon. (Tr. 296). Cooper was admitted to a partial hospital program that she attended on a regular basis until she was discharged on November 14, 2005 to attend another treatment center in Ohio where she planned to move. At the time of her admission, her diagnosis was schizophrenia, paranoid type, and her GAF score was 26.[3] At the time of her discharge, Cooper's diagnosis remained the same, and her GAF score was 46.[4] (Tr. 295-296).

In November 2005, Cooper moved to Ohio. (Tr. 297). On November 15, 2005, she presented to Coleman Professional Services ("Coleman"). (Tr. 297, 285). She was given samples of her current medications. Her goals were to obtain a medication appointment, reduce her symptoms, and improve global functioning. (Tr. 285). Initially, Cooper presented to Coleman on a weekly basis and later on a biweekly basis. (Tr. 279-286)

---

[3] A GAF score of between 21 and 30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

[4] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

On February 14, 2006, Cooper presented to Gary J. Sipps, Ph. D. for a consultive examination.  Dr. Sipps diagnosed Cooper with schizoaffective disorder in partial remission and post-traumatic stress disorder in partial remission with treatment.  Dr. Sipps assigned Cooper a GAF score of 54 with current treatment.  (Tr. 326).  Dr. Sipps opined that Cooper had a low average ability in her capacity for social interaction but was relatively unimpaired in her ability to interact with familiar others.  He also opined that Cooper had a low average ability to concentrate and attend to tasks, adapt to change, and exercise overall judgment.  (Tr. 321-326).

On February 28, 2006, Cooper presented to Nita Arora, M.D. for a psychiatric consultation.  Dr. Arora noted that Cooper was generally doing well; but she also reported that Cooper's paranoia was evident.  (Tr. 327-328).  Dr. Arora diagnosed Cooper with schizoaffective disorder and assigned a GAF score of 60.

On March 28, 2006, Cooper presented for a medication check.  Kristen Richardson, clinical nurse specialist, noted that Cooper had experienced increased paranoia and stress related to her daughter's acute illness; however, at the time of her appointment, her mood had stabilized and her remaining paranoid thoughts were decreasing.  (Tr. 364-365).

On March 29, 2006, Melanie Bergsten completed a Psychiatric Review Technique form ("PRTF") for Cooper.  Bergsten opined that Cooper had moderate restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace.  (Tr.  340).  Bergsten also completed a Mental Residual Functional Capacity Assessment ("MRFC") in which she opined that Cooper was moderately limited in her

5

ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) work in coordination with or proximity to others without being distracted by them; (6) complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) respond appropriately to changes in the work setting, travel in unfamiliar places, or use public transportation; and (11) set realistic goals or make plans independently of others.  (Tr. 344-345).  On December 13, 2006, Dr. Rivera affirmed Bergsten's assessment.  (Tr. 370).

Cooper presented for medication checks in April 2006, June 2006, and August 2006.  During this time, Cooper's mood and appetite were stable, she was sleeping well, and reported no adverse side effects from her medication.  (Tr. 355-365).

On October 30, 2006, Cooper presented to Dr. Arora.  Cooper reported difficulty sleeping, poor concentration and low energy.   She also reported some paranoia and feeling that people were out to get her.  She denied auditory or visual hallucinations.  Dr. Arora noted that Cooper had a very glazed look on her face and a flat affect.  She opined that Cooper appeared over medicated.  Dr. Arora assessed Cooper with a GAF score of 58 and adjusted Cooper's medication.  (Tr. 353-354).

On January 11, 2007, Cooper presented to Dr. Arora for a medications check

6

follow-up. Cooper reported that she was doing very well. Her sleep and appetite were normal. Her mood was good, and she was more social. She was less anxious, and was not having panic attacks. She was also feeling less paranoid. (Tr. 386).

On March 15, 2007, Cooper presented to Dr. Arora for a medications check follow-up. Cooper reported that she was doing better than she had done in quite some time. (Tr. 385). Cooper and Dr. Arora discussed whether Cooper should go back to work and determined that Cooper needed to go through supported employment with the Bureau of Vocational Rehabilitation ("BVR"). (Tr. 385).

Also on March 15, 2007, Dr. Arora completed a medical source statement for Cooper. Dr. Arora opined that Cooper was: (1) slightly limited in her ability to interact appropriately with the public, supervisors, and co-workers; (2) moderately limited in her ability to understand, remember, and carry out short, simple instructions; and make judgments on simple work-related decisions; (3) markedly limited in her ability to understand and remember detailed instructions; and respond appropriately to changes in a routine work setting; and (4) extremely limited in her ability to carry out detailed instructions; and respond appropriately to work pressure in a usual work setting. (Tr. 376-377).

Dr. Arora opined that Cooper's impairments decreased her ability to comprehend, concentrate, and pay attention, and increased her paranoia. Dr. Arora stated that her assessment was based upon Cooper's mental status examination and reports from Cooper's case manager, as well as Dr. Arora's observation of Cooper and Cooper's reports. (Tr. 376-377).

On May 9, 2007, Cooper presented to Dr. Arora for a medications check follow-

up. Cooper reported that she was having some intermittent problems, and believed the Paxil was causing her increased anxiety. Cooper reported that she had been fired from her job at Big Lots for working too slow. Dr. Arora assessed Cooper's GAF at 60. (Tr. 383-384).

On July 2, 2007, Cooper presented to Dr. Arora for a medication check follow-up. Cooper reported that she was generally doing well. Dr. Arora assessed Cooper's GAF at 60. (Tr. 381-382).

On September 11, 2007, Cooper presented for a medication check follow-up. The progress note indicates that Cooper had spent the last three nights in the 23 hour bed in Coleman EPS. Copper had some psychotic features, especially paranoia. She continued to believe that someone was chasing her, and she was anxious. Her GAF score was 50. (Tr. 404-405). On September 13, 2007, Cooper reported that she was still not doing well. Her mental status remained unchanged, and she continued to be paranoid. (Tr. 402-403).

On April 2, 2008, Dr. Arora completed a Medical Source Assessment. Dr. Arora opined that Cooper was not able to complete a normal workday or workweek without interruptions from psychologically based symptoms. Dr. Arora further opined that, "Due to her mental incapacity and intermittent problems with judgment Lola has great difficulty with job settings [and] will perform poorly based on her psychiatric illness and work history." (Tr. 406-407).

### C. Hearing Testimony

Cooper testified that she lived with her mother and her daughter. (Tr. 23). Her mother helps her clean the house and take care of her daughter. (Tr. 23). Cooper has

had a couple of jobs over the past five or six years.  The longest she has kept a job is approximately four months.  Cooper testified that it is hard for her to keep a job because she has difficulty concentrating and becomes paranoid.  (Tr. 23-24).  When she is suffering from paranoia, Cooper thinks people are watching her or trying to hurt her; she hears noises and thinks people are creeping around on the roof.  She also sees lights.  (Tr. 24-25).

Michael Edds, Cooper's case manager, testified that he had been working with Cooper for approximately two months because her permanent case manager was on maternity leave.  (Tr. 31).  As Cooper's case manager, Edds helped Cooper with housing and benefit issues, made sure she took her medication, and helped her get to her psychiatry appointments.  (Tr. 32).  Edds opined that Cooper has difficulty concentrating at work which leads to poor performance.  Her poor performance causes her anxiety, which in turn leads to paranoia.  Edds testified that his opinion was based on his conversations with Cooper, his observations of Cooper, as well as his e-mails with Dr. Arora.  (Tr. 33).  Edds also testified that Cooper had a vocational coach through Coleman who helped her apply for jobs.  (Tr. 34).

The ALJ asked the VE to consider the following individual.  A younger individual with a high school education, with no transferable skills, who could perform a full range of medium work except that the individual could not deal intensely with the public, such as in retail sales, and could not tolerate stress such as in an assembly line job. The VE testified that such an individual could work as a laundry laborer for which there are approximately 500 jobs regionally, 1,500 jobs statewide, and 40,000 jobs nationally; or a housekeeper cleaner for which there are approximately 2,000 jobs locally, 10,000 jobs

9

statewide, and 200,000 jobs nationally. (Tr. 36-37).

Cooper's counsel asked the VE whether an individual who was off task ten percent of the time could maintain employment at the jobs the VE had identified. The VE stated that the individual could not. Cooper's counsel then asked the VE whether an individual who was unable to complete the tasks ten percent of the workday would be able to maintain the identified employment. The VE responded that the individual could not. (Tr. 37). The VE further testified that the requirement of a job coach or special supervision would place an individual outside of the normal work force. (Tr. 37).

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. § 416.1100 and 20 C.F.R. § 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial

gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 404.1520(d) and 20 C.F.R. §416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

The ALJ made the following findings:

> 1. The claimant has not engaged in substantial gainful activity since December 19, 2005, the application date....
>
> 2. The claimant has the severe impairments of schizoaffective disorder and post-traumatic stress disorder....
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at the medium exertional level but with the nonexertional limitations that she cannot deal intensively with the general public (such as retail sales) and cannot tolerate intense stress (such as assembly line jobs).
>
> 5. The claimant has no past relevant work....
>
> 6. The claimant was born on October 6, 1979 and was 28 years old, which is defined as a younger individual age 18-49, on the date the application was filed....
>
> 7. The claimant has at least a high school education and is able to

>communicate in English....
>
>8. Transferability of job skills is not an issue because the claimant does not have past relevant work....
>
>9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the regional and national economy that the claimant can perform....
>
>10. The claimant has not been under a disability, as defined in the Social Security Act, since December 19, 2005, the date the application was filed ....

(Tr.11, 13, 16, 17).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  See *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also* *Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Cooper alleges that the ALJ erred by: (1) failing to adequately explain his reasons for not according controlling weight to the opinion of Cooper's treating physician; and (2)

12

finding there exists a substantial number of jobs in the national economy that Cooper can perform.  The Commissioner disputes these claims.

### A. Treatment of Medical Opinions

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the treating physician's opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the fact finder may choose to disregard the treating physician's opinion.  *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986).  The fact finder must, however, articulate a reason for not according the opinions of a treating physician controlling weight.  *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

Even when a treating physician's opinion is found not to be entitled to controlling weight, it is still entitled to deference:

> Adjudicators must remember that a finding that a treating source medical opinion

is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *4.

When the adjudicator determines that the treating source's opinion is not entitled to controlling weight, he is required to articulate good reasons for the weight given to the treating source's medical opinion.  20 C.F.R. §§ 404.1527(d) (2) and 416.927.

> [T]he ...decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *5.

In this case, the ALJ's reasons for rejecting Dr. Arora's opinions are insufficient. The ALJ finds that Dr. Arora treated Cooper an average of every two months from March 2006 through April 18, 2008, the date of the hearing.  The ALJ notes that Dr. Arora recorded episodes of paranoia, but that these episodes were of a minor magnitude and in correlation with Cooper's noncompliance with medication.  The record does not support this finding as there is no evidence that Cooper was noncompliant with her medication.[5]  Indeed, the record establishes that Cooper was fully compliant with her medication.

---

[5] On October 30, 2006, Dr. Arora noted that Cooper, who was suffering from mild paranoia, appeared over medicated, but there is no indication that any over medication caused Cooper's paranoia.  (Tr. 387-388).

The ALJ also finds that Dr. Arora failed to provide documentation or explanation for the medical assessments she provided.  Again, the record does not support this finding.  In her March 15, 2007 mental source statement, Dr. Arora states that her assessment is supported by her mental status examination and observation of Cooper, as well as reports by Cooper and Cooper's case manager.  (Tr. 377).   In her April 7, 2008 assessment, Dr. Arora states that her opinion is based on Cooper's mental incapacity, intermittent problems with judgment, psychiatric illness, and work history.  (Tr. 407).  Additionally, Dr. Arora provided documentation in the form of her treatment notes.  (Tr. 350-368, 395-405).

Lastly, the ALJ states that Dr. Arora's mental residual functional capacity assessment is given little weight because it is inconsistent with the record.  However, the ALJ fails to articulate the inconsistencies to which he refers.  The ALJ's failure to fully articulate his reasoning deprives this Court of the ability to conduct any meaningful review.

While the Court may not find the ALJ's conclusion untenable, it cannot find that the decision is supported by substantial evidence when the ALJ fails to adequately explain his reasoning.  See *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004) (finding it was not harmless error for the ALJ to fail to make sufficiently clear why he rejected the treating physician's opinion, even if substantial evidence not mentioned by the ALJ may have

15

existed to support the ultimate decision to reject the treating physician's opinion).

### B. The ALJ's Step Five Analysis

A VE's testimony that is based on a hypothetical question that accurately portrays the claimant's physical and mental impairments constitutes substantial evidence to support the ALJ's finding that there exists a substantial number of jobs in the national economy that the claimant can perform.  *Varley v. Secretary of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  In the instant case, the hypothetical question upon which the VE's testimony is based does not accurately portray Cooper's impairments; therefore, the VE's testimony cannot constitute substantial evidence that there exists a substantial number of jobs in the national economy that Cooper can perform.

First, to the extent that the ALJ should have included the limitations set forth in Dr. Arora's opinion, the hypothetical question presented to the VE is inadequate. Additionally, the hypothetical question is inadequate because it fails to include the possibility of future psychotic episodes.  The ALJ concluded that even when Cooper is compliant with her medication, there remains the possibility that she will suffer psychotic episodes in reaction to major stressing events, and that these episodes cannot be anticipated or controlled.  The ALJ assumed that this impairment was addressed by including in his hypothetical question limitations against intense dealing with the general public and intense job stress.  However, there is no evidence to support the ALJ's assumption that these limitations adequately address the functional limitations caused by the possibility of unanticipated and uncontrollable psychotic episodes, which may or may not be in reaction to job stress.  Accordingly, the hypothetical question posed to the

VE did not accurately portray Cooper's impairments; therefore, the VE's testimony based thereon cannot constitute substantial evidence to support the ALJ's finding that there exists a substantial number of jobs in the national economy that Cooper can perform.

### VII. Decision

For the foregoing reasons, the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision of the Commissioner is VACATED and the case REMANDED for further proceedings consistent with this Memorandum Opinion and Order.


IT IS SO ORDERED /s/ Nancy A. Vecchiarelli
                                                                               U.S. Magistrate Judge

Date: May 13, 2010